IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON


OPENSESAME, INC.,

          Plaintiff,

    v.

GO1 PTY, LTD.,

          Defendant.

Case No. 3:21-cv-1258-SI

**OPINION AND ORDER ON CLAIM CONSTRUCTION**


Daniel P. Larsen, BUCHALTER LLP, 805 SW Broadway, Suite 1500, Portland, OR 97205; Willmore F. Holbrow, III, BUCHALTER LLP, 1000 Wilshire Boulevard, Suite 1500, Los Angeles, CA 90017; and Coby S. Nixon and Seth Kincaid Trimble, BUCHALTER LLP, 3475 Piedmont Road, Suite 1100, Atlanta, GA 30305; Of Attorneys for Plaintiff.

Clement S. Roberts, ORRICK, HERRINGTON & SUTCLIFFE LLP, 405 Howard Street, San Francisco, CA 94105; Bas de Blank, Elizabeth R. Moulton, and Jingyuan Luo, ORRICK, HERRINGTON & SUTCLIFFE LLP, 1000 Marsh Road, Menlo Park, CA 94025; Wesley L. White, ORRICK, HERRINGTON & SUTCLIFFE LLP, 51 West 52nd Street, New York, NY 10019; Kristin S. Cornuelle, ORRICK, HERRINGTON & SUTCLIFFE LLP, 1120 NW Couch Street, Suite 200, Portland, OR 97209; and Joshua Popik Glucoft, ORRICK, HERRINGTON & SUTCLIFFE LLP, 355 S. Grand Avenue, Suite 2700, Los Angeles, CA 90071. Of Attorneys for Defendant.

**Michael H. Simon, District Judge.**

In this action brought by Plaintiff OpenSesame, Inc. ("OpenSesame") against Defendant GO1 Pty, Ltd. ("Go1"), OpenSesame seeks a declaratory judgment that Go1 has infringed one or more claims of U.S. Patent No. 8,784,113 ("the '113 Patent"). The parties originally requested

PAGE 1 – OPINION AND ORDER ON CLAIM CONSTRUCTION

that the Court construe four terms in the '113 Patent: "user," "network-side," "client-side," and "content player." On April 6, 2026, the Court held a claim construction hearing, during which the parties agreed upon a construction for "user." Based on the parties' submissions, the arguments of counsel, and the evidence adduced at the hearing, the Court construes the originally disputed terms as set forth below.

## STANDARDS

Patent infringement analysis involves two steps. First, the court construes the asserted patent claims. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (*en banc*), *aff'd*, 517 U.S. 370 (1996). Second, the factfinder determines whether the accused product or method infringes the asserted claims as construed. *Id.* The first step, claim construction, is a matter of law. *See Markman*, 517 U.S. at 372; *Vitrionics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). "It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (*en banc*) (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). Patent claims must precisely define the relevant invention and thereby put both the public and competitors on notice of the claimed invention. *Id.*

"[T]he words of a claim 'are generally given their ordinary and customary meaning.'" *Id.* (quoting *Vitrionics*, 90 F.3d at 1582). There are two exceptions to this general rule: (1) "when a patentee sets out a definition and acts as his own lexicographer," or (2) "when the patentee disavows the full scope of a claim term either in the specification or during prosecution." *Thorner v. Sony Comput. Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012) (citing *Vitrionics*, 90 F.3d at 1580); *see also Hormone Research Found., Inc. v. Genentech, Inc.*, 904 F.2d 1558, 1563 (Fed. Cir. 1990) ("It is a well-established axiom in patent law that a patentee is

PAGE 2 – OPINION AND ORDER ON CLAIM CONSTRUCTION

free to be his or her own lexicographer and thus may use terms in a manner contrary to or inconsistent with one or more of their ordinary meanings." (citation omitted)).

The ordinary and customary meaning "is the meaning that the term would have to a person of ordinary skill in the art in question at the time" of the effective filing date of the patent application. *Phillips*, 415 F.3d at 1313. This is because "inventors are typically persons skilled in the field of the invention," and "patents are addressed to and intended to be read by others of skill in the pertinent art." *Id.* "[T]he person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent," *id.*, which includes the "'written description and the prosecution history.'" *Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1319 (Fed. Cir. 2005) (quoting *DeMarini Sports, Inc. v. Worth*, 239 F.3d 1314, 1324 (Fed. Cir. 2001)).

There are some cases in which "the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction . . . involves little more than the application of the widely accepted meaning of commonly understood words." *Phillips*, 415 F.3d at 1314. "A determination that a claim term 'needs no construction' or has [its] 'plain and ordinary meaning'" may be sufficient when, for example, a term has only "one 'ordinary' meaning or when reliance on a term's 'ordinary' meaning . . . resolve[s] the parties' dispute." *O2 Micro Intern. Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1361 (Fed. Cir. 2008).

In other cases, determining a claim's ordinary and customary meaning requires further examination. This may be because the meaning is not "immediately apparent," terms "have a particular meaning in a field of art," or the patentee has used a term "idiosyncratically." *Phillips*, 415 F.3d at 1314. In those cases, a court construing the claim will consider "those

sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean." *Id*. (quoting *Innova*, 381 F.3d at 1116). Such "sources include 'the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Id*. (quoting *Innova*, 381 F.3d at 1116).

The language of "the claims themselves provide substantial guidance as to the meaning of particular claim terms." *Id*. Additionally, "[t]he context in which a claim term is used in the asserted claim can be highly instructive." *Id*. "Other claims of the patent in question, both asserted and unasserted, can also be valuable sources of enlightenment as to the meaning of a claim term." *Id*. For example, "[b]ecause claim terms are normally used consistently throughout the patent, the usage of a term in one claim can often illuminate the meaning of the same term in other claims." *Id*. Courts should also interpret claim terms in a manner that does not render subsequent claim terms superfluous. *See Stubmo v. Eastman Outdoors, Inc.*, 508 F.3d 1358, 1362 (Fed. Cir. 2007) (noting that the court has "denounced" claim construction that renders phrases "superfluous"); *Merck & Co. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005) ("A claim construction that gives meaning to all the terms of the claim is preferred over one that does not do so.").

In addition to the claims themselves, courts should consider the specification in construing claim terms, as the terms "are part of 'a fully integrated written instrument.'" *Phillips*, 415 F.3d at 1315 (quoting *Markman*, 52 F.3d at 978). As the Federal Circuit has stated: "the specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id*. (quoting *Vitrionics*, 90 F.3d at 1582). A patent's "specification may reveal a special definition given to a

claim term . . . that differs from the meaning it would otherwise possess," and such definition would govern. *Id*. at 1316. Similarly, a specification may "reveal an intentional disclaimer, or disavowal, of claim scope"—and again, "the inventor's intention, as expressed in the specification, is regarded as dispositive." *Id*. Importantly, though, limitations from the specification should not be imported into the claims, and claims should not necessarily be confined to the "very specific embodiments of the invention" in the specification. *Id*. at 1323; *see also Douglas Dynamics, LLC v. Buyers Prod. Co.*, 717 F.3d 1336, 1342 (Fed. Cir. 2013) ("While claim terms are understood in light of the specification, a claim construction must not import limitations from the specification into the claims."); *Kara Tech. Inc. v. Stamps.com Inc.*, 582 F.3d 1341, 1348 (Fed. Cir. 2009) ("The patentee is entitled to the full scope of his claims, and we will not limit him to his preferred embodiment or import a limitation from the specification into the claims."). Ultimately, a court must "read the specification in light of its purposes in order to determine 'whether the patentee is setting out specific examples of the invention to accomplish those goals, or whether the patentee instead intends for the claims and the embodiments in the specification to be strictly coextensive.'" *Decisioning.com, Inc. v. Federated Dept. Stores, Inc.*, 527 F.3d 1300, 1308 (Fed. Cir. 2008) (quoting *Phillips*, 415 F.3d at 1323).

In addition to the text of the claims and specification, courts "should also consider the patent's prosecution history, if it is in evidence." *Phillips*, 415 F.3d at 1317 (quoting *Markman*, 52 F.3d at 980); *see also Graham v. John Deere Co.*, 383 U.S. 1, 33 (1966) ("[A]n invention is construed not only in light of the claims, but also with reference to the file wrapper or prosecution history in the Patent Office."). The prosecution history of a patent "contains the complete record of all the proceedings . . ., including any express representations made by the applicant regarding the scope of the claims." *Vitrionics*, 90 F.3d at 1582. The prosecution history

PAGE 5 – OPINION AND ORDER ON CLAIM CONSTRUCTION

may "inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Abbott Labs. v. Sandoz, Inc.*, 566 F.3d 1282, 1289 (Fed. Cir. 2009) (quoting *Phillips*, 415 F.3d at 1317). For example, a patentee may make "a clear and unmistakable disavowal of scope during prosecution," such as "by clearly characterizing the invention in a way to try to overcome rejections based on prior art." *Comput. Docking Station Corp. v. Dell, Inc.*, 519 F.3d 1366, 1374 (Fed. Cir. 2008) (quotation marks omitted). The Federal Circuit, however, also has cautioned that "because the prosecution history represents an ongoing negotiation between the PTO [Patent and Trademark Office] and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification." *Phillips*, 415 F.3d at 1317. Where there is ambiguity in the prosecution history, it should not limit the claim terms. *See Inverness Med. Switzerland GmbH v. Warner Lambert Co.*, 309 F.3d 1373, 1382 (Fed. Cir. 2002) ("It is inappropriate to limit a broad definition of a claim term based on prosecution history that is itself ambiguous."). Ultimately, the prosecution history "is less useful for claim construction purposes" than the language of the claims and specification. *Phillips*, 415 F.3d at 1317.

Courts may also consider extrinsic evidence in construing a claim, although "while extrinsic evidence 'can shed useful light on the relevant art,' . . . it is 'less significant than the intrinsic record in determining the legally operative meaning of claim language.'" *Id*. (quoting *C.R. Bard, Inc. v. U.S. Surgical Corp*., 388 F.3d 858, 862 (Fed. Cir. 2004)). Extrinsic evidence "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Id*. (quoting *Markman*, 52 F.3d at 980). Specifically, dictionaries—and particularly technical dictionaries—may aid in a court's claim

PAGE 6 – OPINION AND ORDER ON CLAIM CONSTRUCTION

construction. *See id*. at 1318. Expert testimony may also be useful to a court, to the extent that it "provide[s] background on the technology at issue, [explains] how an invention works, [ensures] that the court's understanding of the technical aspects of the patent is consistent with that of a person of skill in the art, or [establishes] that a particular term in the patent or the prior art has a particular meaning in the pertinent field." *Id*. Expert testimony, however, consisting of "conclusory, unsupported assertions . . . as to the definition of a claim term are not useful to a court." *Id.* Further, expert testimony "that is clearly at odds with the claim construction mandated by the . . . written record of the patent" should be discounted. *Id*. (quoting *Key Pharms. v. Hercon Labs. Corp*., 161 F.3d 709, 716 (Fed. Cir. 1998)).

## BACKGROUND

OpenSesame and Go1 create and market "e-learning" technology, the software that makes digital coursework possible. This software starts with a learning management system ("LMS"). The LMS is the part of the software that hosts digital coursework. To access an online class, a student must open an LMS on her internet browser.

In the early 2000s, e-learning technologies had two primary limitations. First, coursework was not easily modified or interactive. After an author created a course, the author had to manually upload it into the LMS. The course would need to be reprogrammed and re-uploaded into the LMS if the author made any changes to it. Similarly, students could not provide feedback in realtime or ask or answer questions about course material while engaging with the course. (For example, the "Are you still watching?" buttons that keep employees vigilant during mandatory office trainings were not yet integrated into e-learning).

Second, coursework was not easily interoperable across platforms or when platforms were modified. For example, when e-learning content standards, such as the Sharable Content Object Reference Model ("SCORM") or the Aviation Industry Computer-Based Training

Committee ("AICC") standards, were periodically updated, a course could freeze or otherwise break.

In 2014, OpenSesame patented a "unique system architecture" aimed at addressing these limitations. '113 Patent at 3:15-16. Instead of requiring e-learning companies to upload static courses directly to the LMS, OpenSesame's claimed invention—the SESAMESEED proxy—allows companies to store their courses remotely. Because a course can now be remotely stored, and not actually uploaded to the LMS, authors can more easily update their courses based on student feedback or in response to changes in SCORM or AICC standards.

## CLAIM CONSTRUCTION

This claim construction dispute involves around four terms in the '113 Patent: "user" (Claims 1, 3, 5, 7, and 11), "network-side" (Claims 1, 5, 8, and 11), "client-side" (Claim 1), and "content-player" (Claims 1, 5, 6, and 11). Claim 1, which contains all disputed terms, reads:

> We claim:
>
> 1. An e-learning delivery system, comprising:
>
> a licensing/reporting server;
>
> a *network-side* content player operably coupled with each of the licensing/reporting server and a content delivery network comprising stored e-learning content; and
>
> a proxy comprising coded instructions stored on a non-transitory computing device-readable medium at the *network-side*, wherein the proxy instructions identify a specific instance of licensed content, and wherein the proxy instructions are configured when executed on a *client-side* computing device to enable a *user* to access and interact with the licensed content via a browser of the computing device and are further configured to report a status of the *user*'s interaction with the content to one or both of the licensing/reporting server and a learning management system (LMS);
>
> wherein the licensing/reporting server includes coded instructions configured when executed to cause the licensing/reporting

PAGE 8 – OPINION AND ORDER ON CLAIM CONSTRUCTION

server to verify a validity status of the user license to the specific instance of content, and upon verifying the validity of the license, the instructions are further configured to cause the licensing/reporting server to provide to the proxy a location designator for accessing the *content player*;

wherein the proxy instructions are further configured, when executed on the *client-side* computing device in response to a request for access to the specific instance of content, to:

cause the *client-side* computing device to request verification by the licensing/reporting server of the validity status of a license to the specific instance of content; and

cause the *client-side* computing device to instruct a browser to access the content player via the location designator; and

wherein the proxy instructions are further configured to relay information to a client-side Learning Management System (LMS) including information indicating a status of content played by the *content player*.

'113 Patent, Claim 1 (emphases added to disputed terms).

## A. "User"

The Court adopts the following construction for the term "user," which the parties agreed to during the claim construction hearing: "A person who uses the e-learning system, such as an author, instructor, training manager, learner, or student." This construction combines many of Go1's and OpenSesame's proposed constructions. It acknowledges that a "user" is an individual person, rather than an institution or other entity. Although organizations may purchase e-learning technologies, only humans can be "users" of the software, as the term "user" is used in the patent.

## B. "Network-Side" and "Client-Side"

The parties dispute the construction of the terms "network-side" and "client-side." OpenSesame proposes that "network-side" be construed as a "[s]et of components managed by one or more providers of the e-learning delivery system that communicate with client-side

components," and "client-side" be construed as a "[s]et of components of the e-learning delivery system managed by one or more authors, instructors, training managers, learners, students, or customers that communicate with network-side components." *See* ECF 102 at 2. Under OpenSesame's definition, a "client-side" component is managed by the client, whereas a "network-side" component is managed by the network.

Go1's definitions, however, are based on the concept of network topology. Network topology, explained in further detail below, is a model of how nodes (*i.e.*, electronic devices, such as routers and modems), are connected and positioned relative to one another. *See* ECF 109 ("Chatterjee Decl.") ¶ 26. Thus, Go1 defines the term "network-side" in relation to the term "client-side." Go1 proposes that "network-side" be defined as "[t]he provider's (that is the server's) end of a client/server connection, as opposed to the client," whereas "client-side" be defined as "[t]he user's (that is the client machine's) end of a client/server connection, as opposed to the server." ECF 102 at 2. The Court adopts Go1's constructions because they "'most naturally align[ ] with the patent's description of the invention,' as further informed by the prosecution history." *AstraZeneca AB v. Mylan Pharmaceuticals Inc.*, 19 F.4th 1325, 1329 (Fed. Cir. 2021) (quoting *Takeda Pharm. Co. Ltd. v. Zydus Pharms. USA, Inc.*, 743 F.3d 1359, 1363 (Fed. Cir. 2014)). To explain why, the Court discusses each in turn.

### 1. Language of the '113 Patent

The '113 Patent uses spatial, or topographical, words to describe how the claimed invention interacts with the "network-side" and "client-side." The patent states, for example, that "[t]he invented system and method operate within each of (and across) a 'client-side' and a 'network-side.'" '113 Patent, 6:48-50. The word "within" denotes that the client- and network-sides each represent their own spatial capacities. The word "across" denotes that the client- and network-sides sit relatively adjacent to one another, and that objects may move between the

PAGE 10 – OPINION AND ORDER ON CLAIM CONSTRUCTION

client- and network-sides. Indeed, the '113 Patent describes the SESAMESEED invention as something that "bridges the network-side and the client-side, originating and interacting with the network-side, but being stored and executed during operation at the client-side." The SESAMESEED could not "bridge" the two sides or be "stored at" the client-side unless those "sides" had some sort of spatial footprint (whether actual or theoretical).

Another spatial treatment that the '113 Patent gives to the terms "network-side" and "client-side" is that the patent uses the terms as both nouns and adjectives (*i.e.*, as noun adjuncts). Claim 1 describes, for example, a "computing device-readable medium at the network-side," and a "client-side computing device." English speakers frequently use places as noun adjuncts—for example, they describe where they eat dinner as "dining room tables," or what they sit in during the day as "office chairs." English speakers also use things that *represent space*, but do not actually have a physical presence, as noun adjuncts. For example, the "left-wing" exists (theoretically), as do "left-wing talking points." The '113 Patent uses "network-side" and "client-side" in the same way: the "sides" represent places (either actual or theoretical) that, when used as noun adjuncts, describe the relative location of things they are describing.

The '113 Patent teaches that these "sides" represent theoretical, rather than actual places. The patent states that "an ordinary skilled artisan will recognize that the physical location of the various system components does not determine whether such components are considered client-side or network-side." '113 Patent, 7:4-7. To illustrate the point, the specification explains that "one or more client-side components can be remotely located from one or more of the network-side components, . . . and the one or more client-side components can be located locally relative to the one or more network-side components." *Id.* at 6:66-7:4.

In Go1's view, "network-side" and "client-side" are used in the '113 Patent to describe an item's location within "network topology." *See* Chatterjee Decl. ¶¶ 26-27. Network topology refers to the relative positions of the nodes in a network, just like a subway map illustrates the relative positions of subway stations, rather than the physical locations or even distances apart to scale of those stations. *Id.* ¶ 26.[1] To graph a building's "network topology," for example, a person would not create a map of all Wi-Fi routers and modems; such a map would identify the nodes' physical locations. Rather, one would diagram how, over the network, the routers and modems in the building communicate with one another. The resulting shape is the office's network topology, representing the relative positions of the connections among the nodes.

In the context of the '113 Patent, Go1 argues that "[w]hat makes something on the 'network-side' or the 'client-side' . . . is relative position—*i.e.*, which end or 'side' of the network connection something is on." *Id.* ¶ 27. Thus, the '113 Patent contemplates a linear network topology with one group of nodes on the client-side and another on the network-side. In this way, "network-side" and "client-side" are used by the '113 Patent to reference two theoretical spaces within the claimed invention's network topology, just as "left-wing" and "right-wing" are used to describe the relative locations of ideas on a political spectrum. As the patent claims, the client-side and the network-side are "bridged" by the SESAMESEED invention.

---

[1] For example, the Washington Metropolitan Area Transit Authority ("Metro") provides system maps. These maps depict, for example, the Glenmont, Wheaton, and Forest Glen stops as being equidistant on the Red Line, with Glenmont directly North of Wheaton and Wheaton directly North of Forest Glen. These stops, however, are not geographically equidistant, and the tracks in fact run Northwest-Southeast. The map does not need to give those details to communicate the relative positions among the stops. For example, the map shows that one must pass through Forest Glen and Wheaton (in that order) to get to Glenmont, which is the northernmost stop on the Red Line.

Figures 1-4 and the patent's specification, read together, confirm Go1's topological reading of "client-side" and "network-side." As the specification describes, there are "two crooked dashed lines" depicted on each of those Figures—above one line is the "OPENSESAME System"; below the other is the "User's System." A group of boxes representing nodes appear on each side. On the "User's System" side, Figures 1-4 depict the Training Manager, Learner, Author, and LMS. *See, e.g.*, '113 Patent Fig. 1. This is the client-side. The specification provides, and both parties agree,[2] that "[g]enerally, although not exclusively, 'client-side' refers to the devices and/or operations of a *training manager* and/or a *learner*, typically including an *LMS*"—the same nodes depicted in Figures 1-4. *See* '113 Patent 6:50-55 (emphases added). On the "OPENSESAME System" side, Figures 1-4 depict the Licensing & Reporting Server, Player, Catalog, CDN, and Payment System. *See, e.g.*, '113 Patent Fig. 1. The specification confirms that this is a visual representation of the "network-side." It states that "[t]he network-side in an exemplary but non-limiting embodiment includes, for example, a *licensing/reporting server*, a content *player*, a *catalog*, and a *CDN*. A *payment system*, when present, is also typically represented on the network side." '113 Patent 6:56-62 (emphases added). Considering all these elements from the '113 Patent, the Court agrees with Go1's topological reading of "network-side" and "client-side"

### 2.  Pre-Claim Construction Positions Taken by the Parties

OpenSesame adopted topology-based definitions during *inter partes* review ("IPR"). "[A]ny explanation, elaboration, or qualification presented by the inventor during patent examination is relevant, for the role of claim construction is to capture the scope of the actual

---

[2] *See* ECF 103 (OpenSesame's Opening Claim Construction Brief) at 10 (quoting same); ECF 105 (Go1's Opening Claim Construction Brief) at 9.

invention that is disclosed, described, and patented." *Iridescent Networks, Inc. v. AT&T Mobility, LLC*, 933 F.3d 1345, 1352-53 (Fed. Cir. 2019). In *Aylus Networks, Inc. v. Apple Inc.*, the Federal Circuit clarified that, because IPR proceedings "involve[ ] reexamination of an earlier administrative grant of a patent," "statements made by a patent owner during an IPR proceeding can be considered during claim construction and relied upon to support a finding of prosecution disclaimer." 856 F.3d 1353, 1361 (Fed. Cir. 2017).

During IPR, OpenSesame argued that Figures 1-4 illustrated the "client-side" and "network-side" as described above. Specifically, OpenSesame argued that a prior art system component could not be considered "a client-side" component because it was "in the server" (a network-side component). *See* ECF 108-2 (Patent Owner's Response to *Inter Partes* Review No. IPR2022-01439) at 48-49. In other words, during IPR, OpenSesame successfully persuaded the Patent Office that one could distinguish between whether something was client-side or network-side by asking whether it was on the client computer or the server.

Similarly, during briefing before the U.S. Magistrate Judge on Go1's motion to dismiss based on lack of patentability, OpenSesame added text to Figure 2 of the patent that mirrors the network topology description discussed above. Where the figure depicts the "User's System," OpenSesame superimposed the text "client-side" in red. Where the Figure depicts the "OPENSESAME System," OpenSesame added the words "network-side." *See* ECF 55 at 8. Under its edited Figure 2, OpenSesame reprinted an edited version of the specification to describe the location of the SESAMESEED invention, again adding the terms "network-side" and "client-side" to provide additional context. Thus, OpenSesame's new description read: "In Figures 1-4, 'the SESAMESEED is positioned in the center of the document to illustrate its role as a bridge between the OPENSESAME [network-side] and customer [client-side]

systems.'" *Id.* (quoting '113 Patent at 7:43-76 (brackets inserted by OpenSesame)). OpenSesame also told the Magistrate Judge that "the actual location of the SESAMESEED changes during the course of at least one usage scenario, from within the licensing/reporting server 14 [on the network-side] to the customer LMS and/or the learner's device 32 [on the client-side]." *Id.* at 9 (quoting '113 Patent at 5:46-50 (again, brackets inserted by OpenSesame)).

The Court sees no reason why it should depart from this topological perspective of "network-side" and "client-side" that OpenSesame itself used both during the IPR and in its briefing before the Magistrate Judge.

### 3. Rejected Definitions

OpenSesame argues that its constructions, which hinge on the concept of "management," are better than Go1's proposed definitions because the '113 Patent expressly disclaims definitions based on physical location. But Go1 agrees with OpenSesame that "network-side" and "client-side" do not denote physical location. *See* Chatterjee Decl. ¶ 29 (quoting '113 Patent, 6:66-7:4). Thus, OpenSesame's concern that Go1's proposed constructions incorporate the physical location of nodes is misplaced.

OpenSesame's proposed construction also introduces ambiguity. Claim construction "should help resolve, not add to, uncertainty in the understanding the finder of fact is to use in applying a claim term." *See Promptu Sys. Corp. v. Comcast Corp.*, 92 F.4th 1372, 1381 (Fed. Cir. 2024). Although a jury may be able to grasp OpenSesame's management concept as applied to the "network-side," it is unclear when a "client" would "manage" the components of an e-learning system. For example, although both parties agree that the LMS is "client-side," a jury might think that this component is "managed" by the "providers of the e-learning delivery system" (and therefore be "network-side") because the LMS is how e-learning courses are delivered to students. This confusion likely will be compounded by the fact that the words

"manage" and "managed" do not appear in the '113 Patent except in the contexts of "learning management system," "training manager," "digital rights management."

The Court therefore adopts the following constructions for the terms "network-side" and "client-side." "Network-side" means: "The provider's (that is, the server's) end of a client/server connection, as opposed to the client's end." "Client-side" means: "The user's (that is, the client machine's) end of a client/server connection, as opposed to the server's end."

## C. "Content Player"

The parties also dispute the construction of the term "content player." OpenSesame argues that no construction is necessary or, in the alternative, that content player should be defined as "software comprising one or more sets of instructions, configured when executed to play content." Go1 proposes the following construction: "Software that plays content provided by the e-learning system." The Court adopts Go1's construction because it better aligns with the "context in which [the] term is used in the asserted claim[s]," which is "highly instructive" to claim construction. *Phillips*, 415 F.3d at 1314.

The Court notes that both parties agree that the term "content player" in this case refers to software. *See* ECF 103 at 13 ("[S]oftware comprising one or more sets of instructions, configured when executed to play content."); ECF 105 at 17 ("Software that plays content provided by the e-learning system."). Thus, the only dispute is whether the software is "configured when executed to play content" or simply "plays content."

The language of the '113 Patent resolves this dispute. When a component has been "configured when executed" to perform a certain function, the '113 Patent expressly says so. *See, e.g.*, '113 Patent at cl. 1 ("the proxy instructions are configured when executed . . . to enable a user to access and interact with the licensed content"; "the licensing/reporting server . . . configured when executed to cause the licensing/reporting server to verify a validity status of the

PAGE 16 – OPINION AND ORDER ON CLAIM CONSTRUCTION

user license"). The fact that the claimed "content player" is not recited to be "configured when executed" is evidence that the patentee intentionally omitted this language. *See Norian Corp. v. Stryker Corp.*, 432 F.3d 1356, 1359 (Fed. Cir. 2005) ("If the patentee had meant to claim the use of at least one type of sodium phosphate in the recited solution, it would have been simple to use the same language in the second portion of the claim that was used in the first."); *cf. Grace Instrument Indus., LLC v. Chandler Instruments Co.*, 57 F.4th 1001 1012 (Fed. Cir. 2023) ("Thus, in claim 14, the same noun modified by the same prepositional phrase is used in the same manner as in claim 4, indicating that the patentee intended the noun and prepositional phrase to be read together."). Accordingly, the phrase "configured when executed" should not be incorporated into the definition of "content player."[3]

Conversely, in Claim 1, the '113 Patent describes a process by which the "client-side computing device . . . instruct[s] a browser to access the content player via the location designator," and then "the proxy instructions are further configured to relay information to a client-side Learning Management System (LMS) including information indicating a status of *content played by the content player*." '113 Patent, 16:47, 17:13-19 (emphasis added). This language teaches that the content player is something that plays content. The Court therefore adopts the following constructions for the term "content player": "Software that plays content provided by the e-learning system."

## CONCLUSION

The Court construes the disputed terms as follows:

---

[3] Further, the phrase "configured when executed to play content" risks confusing the jury. Does it mean: (i) the software is configured such that, after the software is executed, it will then play content, or does it mean that (ii) the software becomes configured after it is executed to play content? Rather than resolve this ambiguity, the Court adopts the construction that better adheres to the plain language of the claims in the '113 Patent.

(a)    "User" is "A person who uses the e-learning system, such as an author, instructor, training manager, learner, or student."

(b)    "Network-Side" is "The provider's (that is, the server's) end of a client/server connection, as opposed to the client's end."

(c)    "Client-Side" is "The user's (that is, the client machine's) end of a client/server connection, as opposed to the server's end."

(d)    "Content Player" is "Software that plays content provided by the e-learning system."

**IT IS SO ORDERED**.

DATED this 5th day of May, 2026.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge